# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 19, 2005　　　　Decided February 10, 2006

No. 04-7158

ALAN V. WASHBURN,
APPELLANT

v.

MICHAEL LAVOIE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00869)

*Alan V. Washburn*, appearing pro se, argued the cause and filed the briefs for appellant.

*Keisha A. Gary* argued the cause for appellees. With her on the brief were *Woody N. Peterson* and *Peter J. Kadzik.*

Before: SENTELLE, HENDERSON, and GARLAND, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: It may be, as Robert Frost wrote, that "[s]omething there is that doesn't love a wall."[1] In this case, however, an even thicker wall might have forestalled what the district court accurately described as a "lengthy and vitriolic neighborhood dispute." *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 212 (D.D.C. 2004). On one side of the wall in question was Alan V. Washburn, an attorney and thirty-year resident of the Georgetown neighborhood of Washington, D.C. On the other side were four Georgetown University undergraduates. Washburn complained that the students were making too much noise. The students complained that Washburn was illegally tape-recording them. Testy letters were exchanged, and Washburn sued the students for defamation. For the reasons explained below, we affirm the district court's grant of summary judgment in favor of the students.

I

Plaintiff Washburn has lived at his address on O Street in Georgetown since at least 1973. In August 2001, defendants Michael Lavoie, Christian Wood, Robert Bercik, and Edmund Donnelly moved into an adjacent townhouse. The property -- located about three blocks from the main gates of Georgetown University -- is owned by Richard and Nancy Itteilag, who rented it to the four students for the duration of their junior and senior years. The two townhouses share a common wall. On the other side of the students' residence, another common wall separated them from Lee Garling and his mother, who has resided in her O Street townhouse for forty-two years.

Shortly after the students moved in, Washburn began complaining that they were too noisy at night and that the noise

---

[1] Robert Frost, *Mending Wall*, *in* THE POETRY OF ROBERT FROST 33-34 (Edward Latham ed., 1969).

frequently disturbed his sleep. Between September 22 and December 28, 2001, Washburn documented his complaints in three lengthy letters directed to Julianne Fultz, Georgetown University's Coordinator of Off-Campus Student Life, and Nancy Itteilag, the students' landlord.

On March 1, 2002, Washburn sent another letter to Fultz, complaining that "spasms of noise" from the students' residence had awakened him eight times during the night of February 27-28, 2002. Joint Appendix (J.A.) 247. According to Washburn, he had made recordings of the noise: "I documented these times with a dictation-type tape recorder. Even though the recorder picks up most background sounds poorly, you can clearly hear sounds from [the students' residence] as I was noting the time and event." *Id*. Washburn offered to bring the recordings to Fultz so that she could have "contemporaneous evidence of the disturbances." *Id*. Washburn's letter also stated that "the frequent and excessive noise . . . constitute[d] a common-law nuisance remediable by the courts" and that he was "prepared to pursue th[at] avenue[]." J.A. 248. Washburn hand-delivered a copy of the letter to the students.

The students consulted with Fultz, who advised them to put their side of the story in writing so that it would be on record with the university. The students began drafting a letter to Fultz; at the same time, they slipped a note under Washburn's door, requesting a meeting. Washburn replied by delivering a letter to the students on the morning of April 16, 2002, again documenting the number of times he had been wakened by noise and stating that his "small dictation-type recorder" had picked up a "burst of laughter" from the students' residence. J.A. 255. Washburn threatened that he had no "reasonable alternative now but to take the matter to court" because he had "exhausted whatever remedies [Georgetown University could] provide." J.A. 256. He sent copies of this letter to Fultz and Itteilag.

Later that same day, April 16th, the students responded in a letter addressed to Fultz, with copies to Washburn and Itteilag. The students expressed concern that Washburn saw their "supposed behavior as a common law nuisance." J.A. 250. They denied Washburn's allegations about noise coming from their residence at night and described their frustration regarding their relationship with him, contending that they "enjoyed a very constructive and cordial relationship with [their] neighbor on the other side, Mr. Lee Garling." J.A. 249. The students recalled only two occasions on which Garling had approached them about noise and stated that they were "confident that [Garling] would attest to the celerity with which [they] met his request" to lower the volume. J.A. 250.

In a passage that would later become the focus of Washburn's defamation suit, the students also expressed alarm that Washburn was recording sounds coming from their residence:

> We are also especially concerned that Mr. Washburn has been, unbeknownst to us, tape recording noises, however faint, that come from our home. This is a clear violation of privacy and something that greatly concerns us. Specifically, we feel Mr. Washburn is violating Section 2511(2)(d) of US Code (attached) that states,

> > It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortuous [sic] act in

> violation of the Constitution or laws of the United States or of any state.
>
> Given this statute, we feel Mr. Washburn is violating our privacy since he was neither a party to the faint communications he recorded, nor was he given any form of consent by any of the parties to the communication. In the same way that Mr. Washburn expects us to adhere to the guidelines of the Georgetown community with regards to . . . appropriate noise levels, we would hope that Mr. Washburn would respect our right to privacy as outlined in the above law.

*Id.*[2] The students repeated that they were upset at "the implicit threats of litigation for 'a common law nuisance' . . . especially since . . . [they had] repeatedly had [their] own rights violated by Mr. Washburn's illegal tape recording." J.A. 251. And they closed with the suggestion to Fultz that "a meeting between Mr. Washburn and the four of us in your office may be the best way to iron out our differences." J.A. 252.

Approximately one year later, on April 11, 2003, Washburn filed this action in the United States District Court for the District of Columbia, invoking the court's diversity jurisdiction. Washburn alleged that he was defamed and placed in a false light[3] by the April 16, 2002 letter's allegation that he had

---

[2]The students attached a copy of the full text of 18 U.S.C. § 2511, as well as a paragraph interpreting the statute that appears to have been taken from a Justice Department website. *See* J.A. 338-43.

[3]"An invasion of privacy-false light claim requires a showing of: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which

violated the students' rights by illegally recording sounds from their residence. He sought $1.5 million in compensatory damages and $6 million in punitive damages for defamation and false light invasion of privacy arising out of the students' "patently false charge that Plaintiff had violated a federal felony law." Compl. ¶ 45.

The district court referred all discovery matters to a magistrate judge, who issued a scheduling order limiting the parties to five depositions per side and setting an initial discovery deadline of January 23, 2004. On August 27, 2003, the students filed a motion to bifurcate the issues of liability and damages and to stay discovery regarding damages, which the district court granted. Just before the scheduled close of discovery, Washburn moved to compel production of all emails between the students that referred to him or the pending lawsuit in any way. The magistrate ordered the students to produce the emails for his in camera review, but ultimately found them irrelevant to the litigation. He also granted an extension of discovery until February 27, 2004.

Two weeks before the extended deadline, Washburn requested an additional extension and an increase in the number of permitted depositions. In support, he produced an affidavit from his neighbor, Garling, who attested that one of the students (Donnelly) told Garling in mid-2002 that Washburn had been

---

places the plaintiff in a false light that would be offensive to a reasonable person." *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 652E (1977)). "The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).

recording noises coming from the students' home and that such action was "illegal." J.A. 160. The magistrate ultimately denied the request for an extension of time and increase in depositions, concluding that it had "come[] too late in the game." *Washburn v. Lavoie*, No. 03-869, Mem. Op. at 7 (D.D.C. May 4, 2004) (Magistrate's Op.).

Following the close of discovery, Washburn moved for summary judgment, contending that the students' statements constituted libel per se and placed him in a false light. The students cross-moved for summary judgment, contending that their statements were protected by the qualified privilege of self-defense. Washburn countered that no privilege attached, and that even if one did, the students had vitiated it through malice and excessive publication. In support of the claim of excessive publication, Washburn relied on the Garling affidavit.

The district court rejected the students' request for summary judgment based on the self-defense privilege, stating that "a genuine issue of material fact exist[ed] as to whether there was excessive publication of defendants' statements, in particular to defendants' neighbor Lee Garling." *Washburn*, 357 F. Supp. 2d at 213 n.4. Nonetheless, and sua sponte, the court entered summary judgment in favor of the students on the ground that, "as a matter of law, the defendants' statements were not capable of a defamatory meaning," *id.* at 215, and did not place Washburn in a "highly offensive light." *Id.* at 216. This appeal followed.

## II

We review the district court's grant of summary judgment de novo. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute about a material fact is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Washburn begins his attack on the district court's grant of summary judgment by noting that the students did not seek judgment on the rationale employed by the court -- that the students' statements were incapable of defamatory meaning -- and that he therefore did not have an opportunity to brief the question. We pretermit the problems posed by this circumstance and instead consider the rationale that was raised and briefed by the opposing parties both in the district court and on this appeal: the qualified privilege of self-defense. Even assuming that the students' statements were capable of a defamatory meaning, we conclude that they were protected by the self-defense privilege. Moreover, and contrary to the view of the district court, we find no genuine issue of material fact as to circumstances that would vitiate the privilege. Because an appellate court may affirm a grant of summary judgment on a ground not relied upon by the lower court, provided that the opposing party has had a fair opportunity to dispute the facts material to that ground, *see Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 326 (D.C. Cir. 1982), we affirm the district court's judgment on the ground of the self-defense privilege.[4]

---

[4]In light of Washburn's threat to file a common-law nuisance lawsuit against the defendants (a threat he ultimately carried out by filing a complaint in District of Columbia Superior Court on August 14, 2002), it might be more apt to analyze this case under the judicial proceedings privilege. This absolute privilege extends to defamatory "communications preliminary to a proposed judicial proceeding . . . if the matter has some relation thereto." RESTATEMENT § 587; *see Brown v. Collins*, 402 F.2d 209, 212 & n.3 (D.C. Cir. 1968). We do

The District of Columbia recognizes the common-law qualified privilege of self-defense as a complete defense to a claim of libel or slander. *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983); *see Novecon Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 566 (D.C. Cir. 1999); *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 656 & n.16 (D.C. Cir. 1966) (citing RESTATEMENT (FIRST) OF TORTS § 594 (1938)). The privilege applies "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." RESTATEMENT (SECOND) OF TORTS § 594 (1977) (RESTATEMENT). The "existence of the privilege is a question of law for the court[;] whether it was abused by the defendant, is a question of fact for the jury," unless summary judgment is appropriate. *Mosrie*, 467 A.2d at 477; *see Novecon*, 190 F.3d at 566.

We have no doubt that the students' interests in avoiding discipline from Georgetown University, averting eviction by their landlord, and guarding against becoming defendants in a threatened common-law nuisance lawsuit were "sufficiently important" to implicate the privilege. RESTATEMENT § 594. Nor do we have any doubt that those interests were under serious attack from the missives fired off by Washburn. The students therefore "had the right to repel the attack . . . and to retort upon [their] assailant if such retort was a necessary part of [their] defense or fairly arose out of the charges made against" them. *Mosrie*, 467 A.2d at 479 (internal quotation marks omitted); *see* RESTATEMENT § 594 cmt. h ("It is enough that the circumstances are such as to lead a reasonable [person] to

not examine the judicial proceedings privilege here, however, because the students did not raise it.

believe that the interest is in danger and that the defamatory publication is reasonably necessary for its protection.").

The students' April 16th letter to Fultz, copied to Itteilag, fairly arose out of Washburn's attack on their interests and constituted a defense against that attack. The letter was sent only to persons who had received Washburn's original correspondence, persons who had the power to sanction the students if they believed his allegations. Indeed, one of the recipients -- Fultz -- had expressly recommended that the students send a letter in order to put their defense on record. And Washburn ultimately named the other recipient -- Itteilag -- as a co-defendant when he made good on his threat to file a (separate) common-law nuisance suit against the students in District of Columbia Superior Court. The majority of the students' letter was a refutation of Washburn's factual allegations. Their specific retort regarding their assailant's tape-recording of noises from their home constituted a challenge to the legality of the evidence he had proffered against them, as well as a suggestion that they also had claims to raise if Washburn pursued his threatened lawsuit. We therefore conclude that the students' April 16th letter is covered by the privilege of self-defense.

Washburn argues that, even if the students' letter were qualifiedly privileged, the privilege was vitiated by the defendants' malice and excessive publication. He is correct that a showing of "excessive publication or express malice" can destroy a qualified privilege. *Curry v. Giant Food Co.*, 522 A.2d 1283, 1294 (D.C. 1987). The burden of proof at this stage, however, rests on the plaintiff. *See Novecon*, 190 F.3d at 567; *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C. 1995); *Mosrie*, 467 A.2d at 477. And as we have noted before, District of Columbia law makes it quite difficult for a plaintiff to overcome a qualified privilege. *Novecon*, 190 F.3d at 567.

The common-law malice necessary to overcome the privilege "emphasize[s] bad faith and evil motive." *Moss v. Stockard*, 580 A.2d 1011, 1026 n.29 (D.C. 1990); *see Mosrie*, 467 A.2d at 477. It is "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss*, 580 A.2d at 1025; *Mosrie*, 467 A.2d at 477. Moreover, "unless the [defamatory] statement is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,'" it is insufficient to support a finding of malice on its own. *Moss*, 580 A.2d at 1024 (quoting *Ford Motor Credit Co. v. Holland*, 367 A.2d 1311, 1314 (D.C. 1977)); *see Novecon*, 190 F.3d at 567. "Mere vehemence, even exaggerated statements . . . will not as a matter of law destroy the privilege or necessarily present a question of fact." *Mosrie*, 467 A.2d at 479 (internal quotation marks omitted).

We do not find the requisite malice in the language of the students' April 16th letter. Washburn does not dispute that he recorded the students. Rather, he disputes the students' characterization of such recording as "illegal." But as the district court found, a reasonable person in the position of the letter's addressees (Fultz and Itteilag) "would have viewed the defendants' accusations to be what they were: statements by highly frustrated students who [were] cleverly, but not expertly, reacting to an attorney's threat of litigation." *Washburn*, 357 F. Supp. 2d at 215. Indeed, the inexpert nature of their accusations is evidenced by the fact that the statutory section quoted in the students' letter does not make any act illegal, but rather describes those acts that are "not unlawful" under the statute. J.A. 250 ("It shall *not* be unlawful under this chapter for a person . . . ." (quoting 18 U.S.C. § 2511(2)(d) (emphasis added))). And while Washburn plainly feels aggrieved by the students' claim that he violated their rights by illegal tape-

recording, this charge is hardly as intemperate as allegations that the District of Columbia Court of Appeals found insufficient to vitiate the self-defense privilege in *Mosrie v. Trussell*, 467 A.2d at 477. There, notwithstanding the court's description of the defendant's statements as "alleg[ing] dereliction of duty and possible criminal abuses" by the plaintiff, *id.*, the court concluded that "[a]ny finding of malice would be based only on speculation, which is not sufficient to send the issue to the jury." *Id.* at 478.

Nor are we persuaded by Washburn's contention that the students vitiated the privilege through excessive publication -- namely, by repeating the illegal tape-recording charge to their neighbor, Garling. The communication to Garling was not a case of "excessive publication," as that rubric does not come into play unless the defendant "knowingly publishes the [defamatory] matter to a person to whom its publication is not otherwise privileged." RESTATEMENT § 604.[5] Here, the publication to Garling was itself covered by the self-defense privilege.[6]

At the time Donnelly spoke to Garling (mid-2002, according to Garling's affidavit), Washburn had repeatedly threatened the students with a lawsuit for common-law nuisance.

_____

[5]Where the matter is published to such a person, the privilege is lost unless the defendant "reasonably believes that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged." RESTATEMENT § 604.

[6]Another reason for not evaluating the communication to Garling under the "excessive publication" rubric is that the students did not give Garling a copy of the April 16th letter, but rather orally told him that Washburn had illegally recorded them. Accordingly, the incident is more accurately viewed as a separate case of alleged slander, as to which we again conclude that the self-defense privilege applies.

Garling -- the students' neighbor on the side opposite from Washburn -- was obviously a potential witness in such a suit. Indeed, the students' April 16, 2002 letter cited their amicable relationship with Garling and expressed their confidence that he "would *attest* to the celerity with which [they] met his request" to quiet down on two occasions. J.A. 250 (emphasis added). Washburn, too, clearly regarded Garling as a witness; he ultimately filed an affidavit from Garling in support of his defamation suit. Given that Garling was a potential witness whom both sides were attempting to persuade, Donnelly's statement to him was made "for the protection of [the students'] own rights or interests" and therefore fell within the privilege. *Dickins v. International Bhd. of Teamsters*, 171 F.2d 21, 24 (D.C. Cir. 1948). And as with the letter to Fultz and Itteilag, the language of the statement to Garling -- who, as a neighbor, was also aware of the context in which it was made -- was insufficient to establish malice.

In sum, we conclude that the qualified privilege of self-defense applies both to the April 16th letter to Fultz and Itteilag, and to Donnelly's mid-2002 oral statement to Garling. The "dispositive issue in this case, as in most cases involving an assertion of qualified privilege, is whether there has been sufficient evidence of malice to overcome the privilege." *Columbia First*, 665 A.2d at 656; *see Novecon*, 190 F.3d at 566-67. Under District of Columbia law, where "the language of the communication and the circumstances attending its publication by the defendant are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant." *Mosrie*, 467 A.2d at 478 (citation and internal quotation marks omitted); *see Novecon* 190 F.3d at 567; *Dickins*, 171 F.2d at 25; *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 291 (D.C. 1977). For the reasons discussed in this Part, we conclude that no reasonable factfinder could find that

the language and circumstances of the communications were not at least as consistent with the non-existence of malice as with its existence, and we therefore affirm the district court's grant of summary judgment. Moreover, because "the same privileges applicable to libel claims may be invoked to defend false light claims," we affirm the grant of summary judgment on the plaintiff's false light claim as well. *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (citing RESTATEMENT § 652G); *see Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002).

III

Finally, we consider Washburn's challenges to three additional rulings, primarily involving pretrial discovery, made prior to the district court's grant of summary judgment. We review such challenges solely for abuse of discretion. *See In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1211 (D.C. Cir. 2004); *Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1032 (D.C. Cir. 2003); *Moattar v. Foxhall Surgical Assoc.*, 694 A.2d 435, 440 (D.C. 1997).

Washburn's first challenge is to the district court's decision to bifurcate the issues of liability and damages, and to stay discovery regarding damages. Washburn contends that if "some issue of 'liability' must be tried by a jury, there will be a serious problem, of constitutional dimension" arising from the bifurcation and stay of discovery. Appellant's Br. 38. But because we affirm the grant of summary judgment, no issue of liability will be tried by a jury, and the error Washburn asserts will therefore have no consequence.

Second, Washburn contends that the district court erred in refusing to order the defendants to produce copies of their emails. Washburn had hoped to find extrinsic evidence of

malice in the emails, and he contends that the court's refusal to order their production denied him the evidence required to vitiate the qualified privilege. But the magistrate judge *did* order the defendants to produce the emails: he ordered them to produce the emails for in camera inspection, and he reviewed them personally. The magistrate found that "nearly half of the emails [were] devoid of anything bearing upon this lawsuit" and that the other half dealt only with "issues such as costs of litigation, retention of counsel, or the need to answer interrogatories." Magistrate's Op. 4. There is, therefore, nothing to plaintiff's claim that he was denied relevant evidence, and we find no abuse of discretion in the magistrate's refusal to require the defendants to disclose the emails to the plaintiff. *See Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994) (noting that "the scope of discovery lies within the district court's discretion").

Finally, Washburn contests the district court's denial of his motion to extend the discovery deadline and to increase the number of permitted depositions. He asserts that he needed the additional time to pursue more "depositions of other persons, such as other neighbors, who might have been recipients" of the defendants' defamation. Appellant's Br. 44.

Washburn did not file this motion until two weeks before the February 27, 2004 discovery deadline. He justifies the delay on the ground that he did not learn of Donnelly's statement to Garling until that time, and hence until then did not have "solid information that the[re] may have been further spread of [d]efendants' accusations." Appellant's Br. 11. But the February 2004 deadline gave Washburn ten months from the filing of the complaint and almost two years from the date of the students' April 2002 letter to obtain information from Garling (who lived just two doors away) and to question any other

neighbors he wished.  As the magistrate explained in denying the request:

> [P]laintiff waited to file his motion until the eve of discovery -- after discovery ha[d] already been extended once.  Simply put, plaintiff's request comes too late, particularly when plaintiff named the source of this new evidence -- his neighbor -- in his own initial disclosures and could have sought his deposition and investigated any information he learned from the deposition well before discovery was set to close.

Magistrate's Op. 8.  In short, Washburn had "ample opportunity prior to the motion for summary judgment to take discovery," and the magistrate judge did not abuse his discretion by concluding that Washburn waited too long to request more time for more depositions. *Zerilli v. Smith*, 656 F.2d 705, 716 (D.C. Cir. 1981); *see Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 294 F.3d 148, 151 (D.C. Cir. 2002) (noting that this court "grant[s] district courts great latitude in determining how much time is adequate" for discovery).

## IV

For the reasons set forth above, the judgment of the district court is

*Affirmed*.