# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 20, 2008　　　　Decided January 27, 2009

No. 07-5383

UNITED STATES OF AMERICA,
APPELLEE

v.

$6,976,934.65, PLUS INTEREST DEPOSITED INTO ROYAL BANK
OF SCOTLAND INTERNATIONAL, ACCOUNT NUMBER
2029-56141070, HELD IN THE NAME OF SOULBURY LIMITED,
AND PROPERTY TRACEABLE THERETO,
APPELLEE

SOULBURY LIMITED,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02540)

———

*Juan Chardiet* argued the cause for appellant. With him
on the briefs was *Daniel M. Press*.

*Robert Stapleton*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief was *A. J.
de Kluiver*, Attorney.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This case is an appeal of an in rem action brought by the United States seeking the civil forfeiture of $6,976,934.65 plus interest on the ground that it was involved in or is traceable to a scheme to launder money earned through an unlawful offshore Internet gambling enterprise. The district court invoked the fugitive disentitlement statute, 28 U.S.C. § 2466 (Supp. V 2005), to grant summary judgment to the government against a claim to the money filed by appellant Soulbury Limited, a British Virgin Islands corporation. The court determined that the company's majority shareholder, William Scott, was evading prosecution in two criminal cases related to the civil forfeiture action by remaining outside the United States. Because we conclude there is a genuine issue of fact whether the disentitlement statute applies to Scott, we reverse.

## I.

William Scott is a former U.S. citizen currently living abroad. According to the government, beginning in 1997 and continuing through 2002, Scott and an associate named Jessica Davis operated a network of offshore Internet gambling sites from the Caribbean that catered primarily to U.S. residents. Hundreds of millions of dollars in bets placed on sporting events flowed from the United States to the Caribbean through these sites.

In March 1998, the United States filed a criminal complaint in the Southern District of New York charging Scott and Davis with conspiracy to violate the Wire Act, 18

U.S.C. § 1084 (2000), by soliciting and accepting sports wagers from U.S. gamblers through the Internet. The court issued a warrant for Scott's arrest, but he was not in the country. Although living abroad, Scott was aware of the criminal proceedings. He appeared in an episode of the Canadian television newsmagazine *the fifth estate*, broadcast in 2001, about the rise of Internet gambling. The report featured Scott's operation of several gambling websites and mentioned the pending criminal charges against him. When the reporter interviewing him stated that there was a warrant out for his arrest, Scott responded, "No, . . . no . . . well you can call it warrant. There is a criminal complaint. Complaint. I have not been indicted. It's a complaint. Which means, yes, if I would go to the U.S., I would probably be arrested." *the fifth estate: The Big Gamble* (CBC television broadcast Oct. 31, 2001).

While Scott and Davis remained abroad, the conspiracy complaint grew stale, but the United States continued its pursuit of the two. The government contends that Scott funneled the proceeds of his unlawful gambling enterprise from Caribbean bank accounts through American bank accounts and into an account at the Royal Bank of Scotland International (RBSI) opened by Scott and held in the name of Soulbury. At Scott's direction, RBSI later transferred $10,000,000 from the account to an investment company controlled by the bank, which invested the money in bonds, insurance funds, and mutual funds held for the benefit of Soulbury in the name of Rock Nominees Limited, Account No. A92.

On December 15, 2003, the government filed this in rem action in the United States District Court for the District of Columbia, seeking civil forfeiture of $6,976,934.65 plus interest. The complaint alleged that the res was subject to

4

forfeiture under 18 U.S.C. § 981(a)(1)(A) as property involved in or traceable to money laundering transactions. The district court issued a warrant for in rem arrest of the funds. Although the forfeitable funds were being held in the Rock Nominees account in the Bailiwick of Guernsey, an island dependency of the United Kingdom located off the coast of France, seizure was possible under 18 U.S.C. § 981(k). That statute provides that forfeitable funds on deposit at a foreign financial institution that has an eligible interbank account in the United States "shall be deemed to have been deposited into the interbank account in the United States, and any . . . arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account . . . may be restrained, seized, or arrested." *Id.* On December 17, 2003, the United States served the arrest warrant on Harris Bank International in New York and seized the funds from RBSI's interbank account with that institution.

Soulbury filed a claim in this action on March 1, 2004, asserting an interest and right in the seized funds and demanding restitution from the government. As required by 18 U.S.C. § 983(a)(4)(B), Soulbury also filed an answer to the government's complaint, denying that the funds were linked to any illegal activity or to Scott and asserting twelve affirmative defenses, including improper venue and failure to state a claim upon which relief can be granted. On the government's motion and over Soulbury's opposition, the district court stayed the forfeiture action on May 28, 2004, in light of ongoing related grand jury investigations in the District of Columbia. Those investigations led to a federal indictment of Scott, Davis, and Soulbury on money-laundering and other charges related to Internet gambling operations. The district court also issued a warrant for Scott's arrest. Although the indictment and warrant issued on April 7,

2005, the district court kept them under seal for over a year based on the government's belief that Davis might enter the country voluntarily. When it became apparent that Davis would not, the government asked the court to unseal the indictment and lift the stay in the civil forfeiture case. The court lifted the stay on March 24, 2006, and unsealed the indictment on May 16, 2006.

Soulbury then filed a motion to dismiss the forfeiture case, again asserting improper venue and failure to state a claim upon which relief can be granted. On the same day, the government moved to strike Soulbury's claim and answer based on 28 U.S.C. § 2466, the fugitive disentitlement statute. The district court denied both motions but instructed the parties to conduct limited discovery into whether Scott owned or controlled Soulbury. Only then could the court determine whether Soulbury's claim could be barred by the fugitive disentitlement statute.

Soulbury initially refused to respond to the government's discovery requests but ultimately stipulated that Scott is its majority shareholder. The United States then filed a motion for summary judgment. Soulbury opposed the motion, again making its arguments in favor of dismissal and also arguing that the fugitive disentitlement statute violates due process.

In an opinion issued on November 8, 2007, the district court concluded that the requirements of § 2466 were met and that Soulbury could not press its claim to the seized funds. The court determined that applying the statute in this case was a proper exercise of its discretion. It rejected Soulbury's due process argument, noting that Soulbury would be free to assert a claim to the funds if Scott submitted to the criminal jurisdiction of the federal courts. The court also rejected Soulbury's argument that it must rule first on the affirmative

defenses, holding that the disentitlement statute barred Soulbury from asserting any challenge to the seizure. The court dismissed Soulbury's claim, granted summary judgment in favor of the United States, and ordered that the funds be condemned as forfeited.

Soulbury appeals. We review the district court's grant of summary judgment de novo, applying the same standard as the district court. *See Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005).

## II.

Although the fugitive disentitlement statute is relatively new, it codifies and extends a well-established common law doctrine. Fugitive disentitlement first developed as a way for courts to dismiss appeals in criminal cases by defendants who had escaped custody after filing the appeal and were evading the jurisdiction of the court. Dismissal was an exercise of the court's inherent power "to refuse to hear a criminal case in error, unless the convicted party . . . is where he can be made to respond to any judgment [the court] may render." *Smith v. United States*, 94 U.S. 97, 97 (1876); *see also Molinaro v. New Jersey*, 396 U.S. 365 (1970).

Some courts extended the doctrine to civil cases, including civil forfeiture actions. Unlike its original application in which the prosecution being evaded and the appeal being dismissed were part of the same case, in the civil context courts could dismiss a claim based on the fugitive's evasion of a related, but separate, criminal proceeding. *See, e.g.*, *United States v. $45,940*, 739 F.2d 792, 798 (2d Cir. 1984) (affirming dismissal of claim to funds forfeited under customs statute by Canadian citizen who refused to face related U.S. criminal charges); *Doyle v. U.S. Dep't of Justice*,

668 F.2d 1365, 1366 (D.C. Cir. 1981) (affirming dismissal of FOIA request related to criminal sentence that appellant was evading by remaining in Panama). Other courts refused to extend the disentitlement doctrine beyond its original application. *See, e.g.*, *United States v. $40,877.59*, 32 F.3d 1151, 1155 (7th Cir. 1994) (finding that there would be a "real injustice" in permitting the government to confiscate property "[b]y simply alleging in the complaint that the claimant is a fugitive and the property is related to the alleged crime from which he has fled").

The Supreme Court resolved the circuit split in *Degen v. United States*, 517 U.S. 820 (1996). The Court explained that, as an exercise of courts' "inherent authority to protect their proceedings and judgments," *id.* at 823, disentitlement must be "a reasonable response to the problems and needs that provoke it," *id.* at 823–24. The Court held that disentitlement of claims in civil forfeiture actions was a disproportionate response to the problem of permitting a fugitive from criminal justice to litigate a related civil proceeding. None of the government's asserted concerns—risk of delay, inability to enforce the forfeiture judgment, use of civil discovery to gain an improper advantage in the criminal matter, preserving the dignity of the court, and deterring flight from criminal prosecution—provided sufficient justification for the extraordinary remedy of dismissing an otherwise valid claim. *See id.* at 828. As a court-made rule, fugitive disentitlement could not be applied in civil cases. The Court noted, however, that it "need not, and d[id] not, intimate a view on whether enforcement of a disentitlement rule under proper authority would violate due process." *Id.*

Congress seized this opening when it enacted the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202 (2001). Section 14 of CAFRA created

the fugitive disentitlement statute, which provides, as amended:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person—
>
> (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution—
>
> (A) purposely leaves the jurisdiction of the United States;
>
> (B) declines to enter or reenter the United States to submit to its jurisdiction; or
>
> (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and
>
> (2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.
>
> (b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.

28 U.S.C. § 2466.

Only one court of appeals thus far has reviewed a district court's application of § 2466. In *Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004), the Second Circuit distilled the statutory requirements for disentitlement into a five-element test: (1) a warrant or similar process has issued in a criminal

case for the claimant's apprehension; (2) the claimant had notice or knowledge of the warrant or process; (3) the criminal case is related to the forfeiture action; (4) the claimant is not confined or otherwise held in custody in another jurisdiction; and (5) the claimant has deliberately avoided criminal prosecution by leaving the United States, declining to enter or reenter the country, or otherwise evading the criminal court's jurisdiction. *See id.* at 198. These five elements track the statutory requirements, and we adopt the same test.

Because Soulbury does not dispute that Scott is its majority shareholder, the district court correctly asked whether Scott "is a person to whom [§ 2466(a)] applies," as § 2466(b) requires. Furthermore, Soulbury admits that the first and fourth elements of the *Collazos* test are satisfied: a warrant has issued for Scott's arrest and Scott is not confined in another jurisdiction. But Soulbury argues that the district court incorrectly granted summary judgment as to the other three elements. The question, therefore, is whether Soulbury raised a genuine issue of material fact as to any of those three elements. We address each element in turn.

**A.**

Section 2466(a) requires not only that a warrant or similar process have issued, but also that the alleged fugitive have "notice or knowledge" of that fact. 28 U.S.C. § 2466(a)(1). The district court concluded that this requirement was satisfied because "either Mr. Scott or his agents had actual knowledge that he was subject to arrest in the United States." *United States v. $6,976,934.65*, 520 F. Supp. 2d 188, 192 n.4 (D.D.C. 2007).

The district court based this conclusion in part on the fact that Soulbury's attorneys, who had represented that they were able to convey messages to Scott, necessarily knew about both outstanding warrants—one issued in New York in 1998 and one in D.C. in 2005—by virtue of their litigation of the civil forfeiture action. (The forfeiture complaint described both warrants.) The court appears to have relied on the well-established principle that a person is "considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)). But Soulbury's attorneys did not represent Scott; indeed, they expressly disavowed representation of Scott to the government. Scott therefore cannot be charged with notice through them.

The district court relied heavily on the fact that Scott is the majority shareholder of Soulbury, explaining that it was therefore appropriate to "impute Soulbury's knowledge of the outstanding warrants to Mr. Scott." *$6,976,934.65*, 520 F. Supp. 2d at 192 n.4. But Scott's status as majority shareholder does not necessarily make him a client of the corporation's attorneys. Shareholders, even majority shareholders, are not ordinarily deemed the "clients" of the corporation's lawyers. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006); *see also* D.C. RULES OF PROF'L CONDUCT § 1.13, cmts. 1–2 (explaining that although an organization can act only through its constituents, "that does not mean . . . that constituents of an organizational client are the clients of the lawyer"); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 96 cmt. b (2000) ("By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals . . . who have an ownership or other beneficial interest in it . . . ."). Although the particular facts of a case may suggest that attribution of a lawyer-client

relationship with a majority shareholder is appropriate, *see* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, *supra*, § 14 cmt. f, the district court made no such factual finding in this case, and we see nothing in the record to support that conclusion.

Nor can Soulbury's knowledge be imputed to Scott on the principle that notice to an agent is imputed to the principal. *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006). Soulbury is not an agent of Scott unless the law of the British Virgin Islands, under which Soulbury is incorporated, so dictates. *See id.* § 3.05 cmt. b (corporation's capacity to act as agent "is a function of the law through which the [corporation] has legal personality"). Neither the parties nor the district court has offered any reason to think that, under British Virgin Islands law, Soulbury is acting as an agent of Scott. And although Scott, as majority shareholder, may in some circumstances be an agent of Soulbury, "[n]otice of facts that a principal knows . . . is not imputed downward to an agent." *Id.* § 5.03 cmt. g. In short, we can discern no basis for the district court's imputation of Soulbury's notice of the outstanding warrants to Scott.

The evidence of Scott's notice or knowledge of the warrants includes the media coverage cited by the district court and Scott's acknowledgement during his televised interview in 2001 that "if I would go to the U.S., I would probably be arrested." *the fifth estate: The Big Gamble*, *supra*. The government argues that this evidence shows notice of the warrants based on the "totality of the circumstances." Br. of Appellee at 13. Soulbury argues that such "constructive notice" is insufficient, and that the disentitlement statute requires that an alleged fugitive have "actual knowledge" that a warrant has issued. Br. of Appellant at 19.

Soulbury is wrong that only actual knowledge will suffice. Section 2466(a)(1) requires "notice or knowledge," and we cannot read the words "notice or" out of the statute. To the extent that Soulbury is arguing that "actual notice" *or* "actual knowledge" is required, we will not supply the word "actual" where Congress did not.[1] All the statute requires is knowledge of an arrest warrant's issuance or notice—that is, reason to know—of that fact. *See* BLACK'S LAW DICTIONARY 1090 (8th ed. 2004) (defining "notice" as "knowledge of" a fact or "reason to know about it"). The district court therefore correctly explained the statutory requirement: "the claimant in the forfeiture case must know or have reason to know that he is subject to arrest in the United States." *United States v. $6,976,934.65*, 478 F. Supp. 2d 30, 39 (D.D.C. 2007). Under this standard, Scott undoubtedly had sufficient notice of the 1998 warrant. During his televised interview, Scott acknowledged that a criminal complaint had been filed against him and that he would likely be arrested if he entered the United States. Soulbury offered nothing to cast doubt on this evidence that Scott knew or had reason to know he was subject to arrest.

Scott's 2001 statement tells us nothing, however, about his notice or knowledge of the 2005 warrant issued by the D.C. district court. The only evidence offered by the government to show Scott was on notice is an Antiguan newspaper article from 2006 citing the recently unsealed D.C. indictment of Scott, Davis, and Soulbury. The district court relied on this article as evidence that news of the criminal charges had reached the government of Antigua, the nation

---

[1] This conclusion is reinforced by the existence of statutes demonstrating that when Congress means to require "*actual* notice or knowledge," it makes that requirement explicit. *See* 7 U.S.C. § 2567 (2000); 26 U.S.C. §§ 3505, 6323, 6332 (2000).

where Scott resides. But the article does not show that this news had reached Scott and, by itself, it is insufficient to satisfy the government's burden to show that there is no dispute that Scott was on notice of the 2005 warrant for his arrest.

Nonetheless, as the district court noted, § 2466 requires only that a fugitive "have notice that he is subject to arrest in the United States. He need not have notice of all warrants for his arrest." *$6,976,934.65*, 478 F. Supp. 2d at 39 n.7. Scott's notice of the 1998 warrant's issuance satisfies the second element of the *Collazos* test.[2]

**B.**

The third element of the *Collazos* test asks whether the civil forfeiture action is "related" to the criminal prosecution being evaded. *See* 28 U.S.C. § 2466(a). To determine whether the 1998 and 2005 prosecutions are related to this forfeiture action, the district court applied a standard found in 18 U.S.C. § 981(g)(4). Section 981(g) permits a court to stay a civil forfeiture proceeding when "civil discovery will adversely affect . . . the prosecution of a related criminal case." *Id.* § 981(g)(1). The statute defines the term "related criminal case" for the purpose of deciding whether a stay is necessary. It instructs a court making that decision to "consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings." *Id.*

---

[2] As discussed in Part II.C, *infra*, Scott may no longer be subject to prosecution on the 1998 criminal complaint because the statute of limitations has run, and there is a genuine question whether that statute is tolled. But the statute of limitations does not apply to the warrant, and we have no other reason to think the warrant is no longer valid. Because Scott has notice of an outstanding warrant for his arrest, this element of § 2466 is satisfied.

§ 981(g)(4). Applying this standard, the district court concluded that both the 1998 and 2005 prosecutions were "related" to the civil forfeiture action.

Neither the district court nor the parties considered that this standard may not apply to the disentitlement statute. But subsection (g)(4) states that its definition applies only "[i]n this subsection." *Id.* It does not offer a generally applicable definition of "relation" between criminal and civil forfeiture cases. Moreover, the elements of § 981(g)(4)'s definition—similarity of parties, witnesses, facts, and circumstances—are tailored to suit the specific discovery concerns addressed by that provision. Although the effect of civil discovery on a related criminal prosecution is a concern that informs fugitive disentitlement, *see Degen*, 517 U.S. at 826, the statute addresses other concerns as well.

We think a better standard to govern the "related" element of § 2466 is found in the statute that provides for civil forfeiture of property related to a criminal prosecution. That statute, 18 U.S.C. § 981(a)(1), specifies the circumstances in which the government may bring a civil forfeiture action to recover property related to a crime. The natural reading of "related" in the fugitive disentitlement statute is that the civil forfeiture action must be one in which the government is proceeding under § 981(a)(1) to recover property "involved in," "derived from," "traceable to," "obtained []by," or "used to facilitate" a crime for which the defendant is evading prosecution. *Id.* In other words, the question is whether the facts that underlie the prosecution being evaded also form the basis for the forfeiture action.

Applying that test, both the 1998 and 2005 prosecutions of Scott are unquestionably "related" to this forfeiture action. The 1998 criminal complaint charged Scott with conspiracy to

violate the Wire Act by "us[ing] a wire communication facility for the transmission in interstate and foreign commerce of bets and wagers on sporting events and contests, and for the transmission of a wire communication which entitled the recipient to receive money and credit as a result of bets and wagers." J.A. at 119. The charge was based on Scott's operation of an Internet sports betting service called World Wide Tele-Sports from 1997 to 1998. The 2005 indictment included the same charge against Scott and the other defendants, and also charged them with international money laundering. The civil forfeiture complaint, brought pursuant to § 981(a)(1)(A), is based on, inter alia, charges of international money laundering with intent to promote a specified unlawful activity. The "specified unlawful activity" being promoted is the Wire Act violation alleged in the 1998 criminal complaint.

Soulbury has not raised a genuine issue of material fact as to the relation between the two criminal prosecutions and this civil forfeiture case. Thus, although the district court applied the wrong standard in making its determination, it correctly granted summary judgment as to this element of the *Collazos* test. *See Washburn v. Lavoie*, 437 F.3d 84, 89 (D.C. Cir. 2006) (noting that "an appellate court may affirm a grant of summary judgment on a ground not relied upon by the lower court").

## C.

The fifth and final question under the *Collazos* test is whether Scott remains outside the United States "in order to avoid criminal prosecution." 28 U.S.C. § 2466(a)(1). The disentitlement statute sets out three specific ways in which this inquiry can be satisfied: if the claimant "purposely leaves the jurisdiction of the United States"; "declines to enter or

reenter the United States to submit to its jurisdiction"; or "otherwise evades the jurisdiction of the court in which a criminal case is pending against the person." *Id.* § 2466(a)(1)(A)–(C). The district court determined that Scott's "constructive flight"—that is, his failure to reenter the United States to face the pending criminal charges—brought him within the second prong of this element. Alternatively, the court found the third prong satisfied because Scott has "otherwise evaded" the criminal jurisdiction of the United States by renouncing his U.S. citizenship and adopting Antiguan citizenship in what the court speculated was an attempt to avoid extradition.

As Soulbury argues, however, the district court erred in concluding that the statute does not require the government to show "that avoiding prosecution is *the* reason Scott has failed to enter the United States and has otherwise evaded its jurisdiction," *$6,976,934.65*, 478 F. Supp. 2d at 41. The plain language of § 2466 mandates this showing by requiring that, under any of the three ways in which the government can prove evasion of jurisdiction, that evasion must have been "*in order to* avoid criminal prosecution." 28 U.S.C. § 2466(a)(1) (emphasis added). Thus, under the second prong, mere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute.[3] The alleged fugitive must have "declined to enter or reenter" the country in order to avoid prosecution. *Id.* § 2466(a)(1)(B). Likewise, under the third prong, Scott's renunciation of his U.S. citizenship is insufficient without some evidence that he took this action to avoid extradition.

---

[3] Although it did not directly address the question, the Second Circuit appears to have reached this conclusion as well, noting that disentitlement is proper for fugitives who "learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution." *Collazos*, 368 F.3d at 199.

Soulbury alleges, and the government does not dispute, that Scott voluntarily left the United States in 1992, long before either the 1998 or the 2005 criminal prosecution. The government has not satisfied its burden on summary judgment to show that Scott remains outside the United States in order to avoid the pending criminal charges. The only evidence that speaks to Scott's intent is the video of his 2001 appearance on *the fifth estate*. In that video, Scott acknowledges the pending criminal complaint and that he would likely be arrested if he returned to the United States. But as Soulbury points out, the video also suggests that Scott did not wish to reenter the United States regardless of any pending criminal charges. Scott told the reporter interviewing him: "I don't mind not going back to the States. There are a few of us that are . . . that are under the same restrictions that would like to go back to the States. Myself, that's fine." *the fifth estate: The Big Gamble*, *supra*. The district court made no finding as to what, if anything, this comment reveals about Scott's reasons for remaining outside the United States. But a court considering summary judgment must draw "all reasonable evidentiary inferences" in favor of the nonmoving party. *Toney v. Bergland*, 645 F.2d 1063, 1066 (D.C. Cir. 1981). Under this standard, Scott's statement is sufficient to raise a genuine issue of fact whether he declined to reenter the country in order to avoid criminal prosecution under the 1998 or 2005 charges.

This is particularly so with regard to the 1998 charges, because it is not clear that Scott could still be indicted based on the complaint filed in the Southern District of New York. Under 18 U.S.C. § 3282(a), "no person shall be prosecuted . . . for any [noncapital] offense . . . unless the indictment is found or the information is instituted within five years next [sic] after such offense shall have been

committed." The complaint charged Scott with criminal conduct continuing through March 18, 1998. No indictment issued on the complaint by March 18, 2003, nor has any indictment issued since. Despite the five-year statute of limitations, Scott might still be subject to prosecution on the 1998 charges. Another statute provides that "[n]o statute of limitations shall extend to any person fleeing from justice." 18 U.S.C. § 3290. But Second Circuit law, which applies to the complaint, requires a showing of intent to prove flight from justice under § 3290. *See Jhirad v. Ferrandina*, 486 F.2d 442, 444 (2d Cir. 1973) (holding that "the government must show an intent to flee from prosecution or arrest before the statute of limitations is tolled"). Scott's 2001 statements to the *fifth estate* reporter are the only evidence of his intent, and there is a genuine dispute as to the conclusions to be drawn from them.

Moreover, as discussed in Part II.A, *supra*, the government has not yet shown that Scott had notice of the 2005 warrant. Without notice of that warrant or the attendant criminal proceedings, it is difficult to say that Scott's purpose for remaining outside the country was to avoid criminal prosecution in the D.C. court.

In light of the factual dispute regarding Scott's intent to avoid criminal prosecution, the district court erred in granting summary judgment on the applicability of the fugitive disentitlement statute to Soulbury through Scott.

## III.

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the government. Under the correct interpretation of the fugitive disentitlement statute, there is a genuine issue of material fact whether Scott

is a person to whom the statute applies and therefore whether Soulbury's claim can be dismissed under the statute. Because we reverse on this ground, we need not consider Soulbury's alternative arguments that the district court should have considered its affirmative defenses of improper venue and failure to state a claim before dismissing on disentitlement grounds, or that the application of the disentitlement statute to Soulbury violates due process.[4] We remand for further proceedings consistent with this opinion.

*So ordered.*

---

[4] Nor need we address the challenge to the statute's constitutionality under the Excessive Fines Clause of the Eighth Amendment, which Soulbury waived by failing to raise it in its opening brief. *See Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) (holding that "issues not raised until the reply brief are waived").