RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0308p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　　　*Plaintiff-Appellee*,


　　　*v.*

No. 07-4487

MAHMOUD F. SALTI,

　　　　　　　　　*Defendant*,


MOHAMMED F. SALTI, aka Mike Salti, Sr.,
nka Mohammed Al Ammouri; USRAH MARY
SALTI,

　　　　　　　　　*Claimants-Appellants*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 96-00153-001—Peter C. Economus, District Judge.

Argued: December 2, 2008

Decided and Filed: August 25, 2009

Before: MOORE and WHITE, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Richard Stoper, Jr., ROTATORI BENDER, L.P.A., Cleveland, Ohio, for Appellants. James L. Morford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Richard Stoper, Jr., ROTATORI BENDER, Cleveland, Ohio, for Appellants. James L. Morford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

WHITE, Circuit Judge.  Mohammed F. Salti, also known as Mike Salti, Sr., and now known as Mohammed Al Ammouri (Al Ammouri), and his wife Usrah Mary Salti (Mary Salti) appeal the district court's dismissal of their petition asserting an interest in a Swiss bank account the court had ordered forfeited as a result of the Government's plea agreement with Al Ammouri's nephew, Mahmoud F. Salti, also known as Mike Salti, Jr. (Mahmoud).  On the Government's motion, the court dismissed Al Ammouri's claim pursuant to the fugitive disentitlement statute, 28 U.S.C. § 2466, and dismissed Mary Salti's claim finding she lacked standing.  We REVERSE and REMAND.

## I.  BACKGROUND

On May 8, 1996, a grand jury in the Northern District of Ohio returned a nine-count indictment against Al Ammouri and his nephew Mahmoud (collectively, defendants).  Counts 1 and 2 charged conspiracy to commit food stamp fraud, and counts 3 and 4 charged conspiracy to commit domestic and international money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i) by concealing the nature, source, ownership, and control of the proceeds of the fraud.  Among the money laundering allegations was that certain food-stamp redemption funds were "co-mingled with other SALTI monies in order to render them untraceable."  The indictment further alleged that "[f]or extended periods of time," Al Ammouri "resided" in Jordan, that defendants used official bank checks to "transport [Al Ammouri]'s food stamp trafficking profits to him in Jordan," including "co-mingled" proceeds, and that multiple checks were cashed in the Jordan Gulf Bank in Amman, Jordan.

Mahmoud initially pleaded not guilty to Counts 1-5, 8, and 9, but subsequently changed his plea on those counts to guilty.  Mahmoud admitted that he and Al Ammouri operated a conspiracy from at least April 24, 1985 until April 8, 1994 that generated illegal profits by purchasing approximately $7,000,000 of food stamps and Women,

Infants, and Children coupons for less than face value.  Mahmoud further admitted that he and Al Ammouri laundered the proceeds of their food-stamp trafficking, including by transporting cash and official bank checks to Al Ammouri in Jordan, where the checks were cashed at the Jordan Gulf Bank.

On April 20, 2006, the district court approved an addendum to Mahmoud's plea agreement, pursuant to which Mahmoud agreed to forfeit all property, real and personal, involved in the money laundering counts of the indictment (Counts 3 and 4) and all property traceable to such property.  Mahmoud stated that "from at least as early as 1985 and continu[ing] until in or about 1995," he was "jointly engaged" with Al Ammouri in the commission of the money laundering offenses, and the checks, cash, and money orders they laundered "constituted proceeds of joint criminal activity."  The court entered an Order of Forfeiture pursuant to 18 U.S.C. § 982(a)(1), which included a provision stating that "[s]hould the United States identify and locate any of this property, the Court will enter an Amended Order of Forfeiture under 21 U.S.C. § 853 [as incorporated by 18 U.S.C. § 982(b)(1)(A)], authorizing the seizure of such property and its disposition in accordance with law."

In November 2006, Mahmoud and the Government entered into an agreement stating that, pursuant to 18 U.S.C. § 982(a)(1), Mahmoud would forfeit "Arab Bank (Switzerland), Ltd., Zurich – Account Number 10.191146-0 in the name of Mohammed Al Ammouri . . . , and its contents (approximately $750,000.00)" (the Swiss Account), and that this property "was involved in Counts 3 and 4 of the indictment, and/or is traceable to such property."  The Government requested that the district court approve an amended order of forfeiture, stating that its request was supported by a sealed affidavit of Special Agent Kevin Ganger of the United States Department of Agriculture's Office of Inspector General.  Finding that the property was subject to forfeiture due to its involvement in Counts 3 and 4 and/or its traceability to such property, the district court entered an amended order, ordering that the Swiss Account in Al Ammouri's name and its contents be forfeited to the United States.  The court further ordered that notice be published pursuant to 21 U.S.C. § 853(n)(1), and that, "[t]o

the extent practicable, the United States may also provide direct written notice" to Al Ammouri, whom the court identified as "a person potentially having an interest in the property identified." The court stated that, "[f]ollowing completion of notice, this Court will enter a final order in accordance with 21 U.S.C. § 853(n)."

On January 17, 2007, Al Ammouri and his wife Mary Salti filed a signed petition with the court pursuant to 21 U.S.C. § 853(n), in which they claimed an interest in the Swiss Account. They alleged that Al Ammouri is "the owner" of the Account and that Mary Salti has "an interest" in the Account. They "assert[ed] right, title and interest in the entirety of the Account," alleging that they "acquired their right, title and interest . . . prior to the offenses alleged in the indictment in this case." Alleging Al Ammouri "has suffered from heart disease and other physical conditions" for "several years," the petition stated that Al Ammouri "maintained accounts" (including, presumably, the Swiss Account) as part of "making provisions for his wife . . . after his death." As to the funds in the accounts at the Arab Bank, petitioners alleged that

> [a]t various times, the numbers and names on the accounts have changed. In the early 1990s, the funds now in the Account were in an account in the name of Mary Salti. The monies in the Account, in whatever form, have at all times been held by Mike Salti, Sr., Mary Salti or others in trust for the use and support of Mary Salti, due to the debilitating and serious health conditions of Mike Salti, Sr. The accounts were not all placed in the name of Mary Salti because at all relevant times Mary Salti had a power of attorney for Mike Salti, Sr., and therefore, had access to the accounts.

Petitioners stated that no monies related to the matters alleged in the indictment were deposited in the Swiss Account "or any predecessor or related account, either directly or indirectly," and declared that the funds currently in the Swiss Account "are not the proceeds of any criminal activity or traceable to any monies used in the course of any crime." They requested a hearing to adjudicate their interest in the Account so that their interest could be excepted from forfeiture.[1]

---

[1] The petition also alleged that the Government previously initiated a separate civil action seeking damages related to "identical" matters alleged in the criminal indictment against Al Ammouri and Mahmoud; that the district court at one point quashed a writ of garnishment, resulting in the Government returning seized property to Mary Salti; and that Mary Salti thereafter entered into a Consent Judgment

The Government filed a motion to dismiss the petition, arguing that Al Ammouri's claim should be dismissed pursuant to the fugitive disentitlement statute and that Mary Salti's claim should be dismissed for lack of standing because she has no "legal interest" in the property. The Government based its fugitive disentitlement argument in part on an attached Declaration of Special Agent Ganger of the Department of Agriculture, who was one of the agents who conducted the criminal investigation of Al Ammouri and Mahmoud. As for Mary Salti's claim, the Government argued that even assuming the funds in the Swiss Account were legitimate and not the proceeds of illegal activity, Mary Salti was not an "owner" of the Swiss Account and had no "legal interest" in it.

Petitioners opposed the Government's motion. They argued that Al Ammouri's claim should not be dismissed on fugitive disentitlement grounds and that doing so would violate his due process rights, the Ex Post Facto Clause, and the Eighth Amendment. They further argued that Mary Salti has standing because she has power of attorney to act for Al Ammouri, the Swiss Account contains funds transferred from other accounts in her name, she has a marital property interest, and she should be considered the beneficiary of a constructive trust in the Swiss Account's funds. Petitioners argued that Ganger's declaration should be stricken and claimed they were entitled to discovery and a hearing. Along with their opposition memorandum, petitioners submitted signed declarations of Al Ammouri and Mary Salti, bank records, reports and documentation regarding Al Ammouri's medical history, a document in which Al Ammouri gave his wife power of attorney under Ohio law, and texts of various laws.

On November 30, 2007, the district court granted the Government's motion to dismiss, ruling that Al Ammouri's claim was barred by the fugitive disentitlement statute

---

and Settlement Agreement with the Government requiring her to pay $75,000, "resolving all matters relating to her potential liability for the matters underlying the Civil Action," and releasing her from all claims arising from the same conduct as that alleged in the criminal indictment and in "the papers relating to forfeiture." The petition stated that because Mary Salti signed the agreement and has complied with it, the Government is barred from obtaining forfeiture of her interest in the Swiss Account. The district court did not address this contention when it dismissed the petition.

and that Mary Salti lacked a legal interest in the Swiss Account and thus was without standing to assert her claim. The court issued its Final Order of Forfeiture on December 4, 2007. This appeal followed.

## II.  DISCUSSION

### A.     Statutory and Procedural Context

The criminal forfeiture statute at issue provides in pertinent part that "[t]he court, in imposing sentence on a person convicted of an offense in violation of [the money laundering statute, 18 U.S.C. § 1956], shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). It further provides that "[t]he forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by" all provisions, except subsection (d), of 21 U.S.C. § 853. *Id.* § 982(b)(1).

Under section 853, a third party "asserting a legal interest in property which has been ordered forfeited to the United States" may petition the court for a hearing to adjudicate "the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2).[2] "The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition." *Id.* § 853(n)(4). The petitioner and the Government may present evidence and witnesses at the hearing. *Id.* § 853(n)(5). The petitioner ultimately bears the burden of establishing the petitioner's third-party claim by a preponderance of the evidence:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
>     (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or

---

[2]"The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." 21 U.S.C. § 853(n)(3).

was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

*Id.* § 853(n)(6).[3]   The statute instructs that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." *Id.* § 853(o).

Federal Rule of Criminal Procedure 32.2, which was adopted in 2000, sets out, *inter alia*, the "ancillary proceeding" to be used when a third party files a petition in a criminal forfeiture proceeding.[4]   Subsection (c)(1) of the rule establishes the following procedure:

If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding, but no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment.

(A) In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason. For purposes of the motion, the facts set forth in the petition are assumed to be true.
(B) After disposing of any motion filed under Rule 32.2(c)(1)(A) and before conducting a hearing on the petition, the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure if the court determines that discovery is necessary or desirable to resolve factual issues. When discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56.

Fed. R. Crim. P. 32.2(c)(1).   The Advisory Committee's notes state that although "it would not be appropriate to make the Civil Rules applicable in all respects," there are

---

[3] Petitioners in the instant case are proceeding under subparagraph (A) of this provision.

[4] This rule was adopted to supplement the statutory scheme for determining third-party claims, as "[e]xperience has shown that ancillary hearings can involve issues of enormous complexity that require years to resolve" and "[i]n such cases, procedures akin to those available under the Federal Rules of Civil Procedure should be available to the court and the parties to aid in the efficient resolution of the claims." Fed. R. Crim. P. 32.2(c) advisory committee's note.

"several fundamental areas in which procedures analogous to those in the Civil Rules may be followed," including "the filing of a motion to dismiss a claim" and "disposing of a claim on a motion for summary judgment." Fed. R. Crim. P. 32.2(c) advisory committee's note. The rule, "[w]here applicable, . . . follows the prevailing case law on the issue." *Id.*

**B.     Al Ammouri's Claim**

We first consider Al Ammouri's arguments regarding the district court's application of the fugitive disentitlement statute, 28 U.S.C. § 2466, to dismiss his third-party claim. "[T]he ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court" once the statutory prerequisites of the fugitive disentitlement statute are satisfied. *Collazos v. United States*, 368 F.3d 190, 198 (2d Cir. 2004). "[T]he legal applicability of § 2466 to [petitioner's] forfeiture claim" is reviewed *de novo*, and "to the extent we conclude that the statute is applicable . . . , we review the district court's decision to order disentitlement for abuse of discretion." *Id.* at 195; *cf. March v. Levine*, 249 F.3d 462, 469 (6th Cir. 2001) (reviewing a district court's application of the fugitive disentitlement doctrine and holding that the court did not abuse its discretion when it declined to order disentitlement). "A district court abuses its discretion when it relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." *Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004).

The district court dismissed Al Ammouri's claim pursuant to the fugitive disentitlement statute, 28 U.S.C. § 2466, which Congress enacted as part of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202. This section states:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person--

(1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution--
(A) purposely leaves the jurisdiction of the United States;
(B) declines to enter or reenter the United States to submit to its jurisdiction; or
(C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and
(2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.
(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.
28 U.S.C. § 2466.

The Second Circuit was the first to apply the fugitive disentitlement statute. Tracking the statutory language, the Second Circuit identified five prerequisites to disentitlement under § 2466:

(1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant.

*Collazos*, 368 F.3d at 198; *see also id.* (observing that "[e]ven when these requirements are satisfied . . . , § 2466 does not mandate disentitlement").  The D.C. Circuit recently adopted this five-element test, *United States v. $6,976,934.65, Plus Interest Deposited into Royal Bank of Scot. Intern., Account No. 2029-5614070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 128 (D.C. Cir. 2009), and we do so as well.

In the instant case, the district court ruled that all elements of the statute had been satisfied and disallowed Al Ammouri's claim.  Petitioners argue that the district court erred in deciding this question on a motion to dismiss prior to allowing for discovery and a hearing.  They also contend that "the district court improperly found that Mr. Al Ammouri declines to enter the United States or is evading the jurisdiction of the

court"—that, "[a]t a minimum, issues of fact exist regarding whether Al Ammouri is 'deliberately' and 'purposely' evading the jurisdiction of the district court," as "there are factual issues regarding whether Mr. Al Ammouri can return to the United States" due to his allegedly poor health.

We reject petitioners' first argument. Rule 32.2 makes clear that before any discovery is taken, a motion to dismiss may be brought to dismiss a third party's claim "for lack of standing, for failure to state a claim, or for any other lawful reason." Fed. R. Crim. P. 32.2(c)(1)(A).[5] It also states that "*[a]fter* disposing of" a motion to dismiss and "*before* conducting a hearing on the petition," a court may permit discovery to resolve factual issues if it would be necessary or desirable. Fed. R. Crim. P. 32.2(c)(1)(B) (emphasis added). Thus, discovery and a hearing are not required prior to a ruling on a motion to dismiss.[6]

Petitioners also argue that in considering the motion to dismiss Al Ammouri's claim, the district court did not assume that the facts set forth in the petition were true, *see* Fed. R. Crim. P. 32.2(c)(1)(A), and instead impermissibly resolved disputed issues of fact to determine that Al Ammouri is a "fugitive" as defined by the fugitive disentitlement statute. We agree that the district court erred when it decided as a matter of law that Al Ammouri is a "fugitive" and thus dismissed his claim. We are persuaded by the D.C. Circuit's recent reversal of a district court's application of the fugitive disentitlement statute, on the Government's motion for summary judgment, where the district court had disallowed a claim in a forfeiture proceeding. *$6,976,934.65*, 554 F.3d 123. Discussing the fifth disentitlement element, the D.C. Circuit found that the district court erred in holding that the government need not "show 'that avoiding prosecution

---

[5]We agree with the district court that dismissing a claim on fugitive disentitlement grounds falls into the category of "any other lawful reason."

[6]Even before the enactment of Rule 32.2, we allowed courts to dismiss claims without first holding a hearing. *See, e.g., United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir. 1988) (as amended) ("We conclude . . . that the district court did not err in its conclusion that the claimants failed to allege or make a prima facie showing of any legal right, title, or interest in the forfeited property and thus no hearing or trial was mandated . . . ."); *see also United States v. O'Brien*, 181 F.3d 105, 1999 WL 357755, at *3 (6th Cir. 1999) (unpublished disposition) ("[Third-party petitioner] did not and cannot make a prima facie showing of a legal right, title or interest in the [property]. . . . The district court therefore did not err in declining to provide her with a hearing on the matter.").

is *the* reason [the individual] has failed to enter the United States and has otherwise evaded its jurisdiction.'" *Id.* at 132 (quoting *United States v. $6,976,934.65*, 478 F. Supp. 2d 30, 41 (D.D.C. 2007) (emphasis in the original)). The D.C. Circuit held that "[t]he plain language of § 2466 mandates this showing by requiring that, under any of the three ways in which the government can prove evasion of jurisdiction, that evasion must have been '*in order to* avoid criminal prosecution.'" *Id.* (quoting § 2466(a)(1) (emphasis added by D.C. Circuit)). It ruled that "[i]n light of [a] factual dispute regarding [the fugitive's] intent to avoid criminal prosecution, the district court erred in granting summary judgment on the applicability of the fugitive disentitlement statute." *$6,976,934.65*, 554 F.3d at 133.

The district court in the instant case similarly erred in granting the Government's motion to dismiss based on the fugitive disentitlement statute. Petitioners dispute that Al Ammouri is "deliberately avoid[ing] prosecution." *Collazos*, 368 F.3d at 198.[7] They maintain that Al Ammouri has "suffered from poor health for several years," and that there are "factual issues regarding whether Mr. Al Ammouri can return to the United States." The petition states that "[f]or several years, [Al Ammouri] has suffered from heart disease and other physical conditions." In opposing the Government's motion to dismiss, Al Ammouri averred in a declaration filed with the district court that "[f]or many years I have suffered from heart disease and related conditions and have had many surgeries," and that he held monies in trust for the use and support of his wife "[d]ue to

---

[7]To the extent petitioners argue that Al Ammouri's not being a fugitive when he departed the United States is dispositive, they are mistaken. The fugitive disentitlement statute applies to persons who "decline[] to *enter or reenter* the United States to submit to its jurisdiction." 28 U.S.C. § 2466(a)(1)(B) (emphasis added); *see also Collazos*, 368 F.3d at 199 ("fugitives" subject to disentitlement include those who "learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution"). As the Second Circuit concluded, Congress's use of this statutory language even "extends disentitlement authority . . . to persons who, although they may have never set foot within the territorial jurisdiction of the United States, know that warrants are outstanding for them and, as a result, refuse to enter the country." *Collazos*, 368 F.3d at 199-200; *see also id.* at 198 ("the statutory disentitlement power conferred by Congress is not limited . . . to common-law fugitives"). *But see id.* at 206 (Katzmann, J., concurring) ("agree[ing] that we are bound to adhere to the unambiguous meaning of a statute," but suggesting that "the supporters of the legislation may not have intended to sweep as broadly as the statutory text suggests"; reviewing the legislative history of CAFRA and observing that "[a]dministration sponsors of the '[f]ugitive disentitlement' section and the 'enter or reenter' language opined on several occasions . . . that the provision simply reinstated the common law doctrine of fugitive disentitlement"). Al Ammouri's leaving the United States before "a warrant or process [was] issued for his apprehension," 28 U.S.C. § 2466(a)(1), does not on its own preclude status as a "fugitive" under the disentitlement statute.

my poor health." He also filed multiple medical records and documents with the court detailing his medical history. The most noteworthy of these is a January 17, 2007 letter purportedly from a doctor at the Al-Essra Hospital in Jordan stating that Al Ammouri "recently had open heart surgery," "is in poor general condition with significant angina and effort limiting symptoms," and "is unable to travel because he is too frail and fragile due to his current health condition."

In rejecting Al Ammouri's challenge to the application of the fugitive disentitlement statute, the district court reasoned that the statute does not contain a "health exception," and that petitioners' argument that "it is impossible for Al Ammouri to return to the U.S. due to illness[, and that] therefore[] he cannot be found to have deliberately or purposefully evaded the jurisdiction of the Court," is "irrelevant as a matter of law." While there is no such express exception in the statute, a petitioner's alleged ill health is clearly relevant to whether the petitioner is "deliberately avoid[ing] prosecution by . . . declining to enter or reenter the United States," *Collazos*, 368 F.3d at 198, and such an argument is properly asserted in response to the Government's attempt to apply the fugitive disentitlement statute. The district court erred in only considering Al Ammouri's claimed ill health as part of its ultimate consideration whether to disentitle Al Ammouri after it had determined that the five elements were satisfied. If Al Ammouri is indeed too sick to travel, such that his illness is what prevents him from returning to the United States, the Government has not shown as a matter of law that Al Ammouri's being in Jordan, and not the United States, is "in order to avoid criminal prosecution." *Cf. id.* at 201 (ruling that disentitlement was appropriate when the individual in question "made a *conscious choice* not to 'enter or reenter the United States' to face the criminal charges pending against her" and when "nothing in the record indicates that [she] was ever confined, incarcerated, or otherwise *unable to travel* to the United States of her own volition in the months before the district court ordered disentitlement" (emphasis added)).[8]

---

[8] We do not consider the video contained in the Joint Appendix that the Government contends establishes that Al Ammouri "is a healthy man." This video was not a part of the record that the district court had before it when deciding the Government's motion to dismiss. Moreover, the Government's contention that forty seconds of video showing "a man"—allegedly Al Ammouri—"carrying a pink

We note that the district court's failure to recognize that the petitioner's health is relevant to whether the petitioner is "deliberately avoid[ing] prosecution" would not necessarily require reversal, so long as the court properly considered the petitioner's alleged ill health in its discretionary analysis after determining that all five elements for fugitive disentitlement had been satisfied. Here, the district court's discussion of Al Ammouri's health in its discretionary analysis does not convince us that Al Ammouri's health-related allegations and supporting evidence were given the consideration they are due at this early stage of the proceedings. The court considered doctors' reports and the allegations of Al Ammouri's ill health, but said that Al Ammouri's history of heart problems before he left the United States in 1995 and alleged plea negotiations between Al Ammouri's counsel and the Government in 2005 left it "unconvinced that Al Ammouri has not been able to return to the U.S. during the last six years." Yet the proffered doctor's note saying Al Ammouri was too ill to travel was dated in 2007—after the apparently unsuccessful plea discussions the Government contends were to facilitate Al Ammouri's return to the United States. Even if such negotiations cast doubt on Al Ammouri's earlier claims of ill health, and thus on all such claims, that is all they do—cast doubt. The district court's discussion of the various facts and its statement that it was "unconvinced" persuades us that it was improperly and prematurely weighing evidence to resolve a "factual dispute regarding [Al Ammouri's] intent to avoid criminal prosecution." *See $6,976,934.65*, 554 F.3d at 133.

We therefore reverse as to the district court's application of the fugitive disentitlement statute to dismiss Al Ammouri's third-party claim.[9] In so ruling, we do not suggest that the district court will necessarily be unable to apply the fugitive disentitlement statute to Al Ammouri at a subsequent stage on remand.[10]

---

umbrella and wearing a black overcoat[] with a white tie" proves that Al Ammouri is "very healthy and robust" and "directly contradicts" Al Ammouri's argument of poor health is a stretch.

[9]Accordingly, we do not consider Al Ammouri's arguments that the court's application of the disentitlement statute violated various constitutional rights. *See $6,976,934.65*, 554 F.3d at 133.

[10]At an early stage of the *$6,976,934.65* case discussed *supra*, the district court acknowledged that it was "considering the strong step of disallowing a claim in a forfeiture action" and "desire[d] to ensure that the claimant [received] a full hearing on the question of disentitlement." *$6,976,934.65*, 478

## C.     Mary Salti's Claim

Turning to our examination of the district court's dismissal of Mary Salti's claim for lack of standing, we "review the district court's interpretation of the federal forfeiture laws *de novo*. . . . [T]he district court's findings of fact are reviewed under a clearly erroneous standard and the question of whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed *de novo*." *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001) (citations omitted). "Whether a claimant has standing to contest a forfeiture is a determination of law, and therefore this court reviews the district court's determination of standing de novo." *United States v. 37.29 Pounds of Semi-Precious Stones*, 7 F.3d 480, 483 (6th Cir. 1993), *abrogated on other grounds by United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993).

In an ancillary proceeding, a court may dismiss a third-party petition for lack of standing. Fed. R. Crim. P. 32.2(c)(1)(A). Under Rule 32.2, "a motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." *Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004).[11] "A claimant need

---

F. Supp. 2d at 45. The court declined to dismiss the claim, but instead "convert[ed] the government's motion under § 2466 to one for partial summary judgment under Rule 56, and permit[ted] . . . the parties 90 days to conduct limited discovery on the applicability of the fugitive disentitlement statute." *Id.* at 45-46. Discovery was expressly limited to the fugitive disentitlement question, and the petitioner was reminded that the court could impose sanctions, including deeming certain matters conceded and dismissing with prejudice, if the petitioner refused to cooperate with the Government's discovery requests. *See id.* at 46 & n.11; *cf. Degen v. United States*, 517 U.S. 820, 827 (1996) ("A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case."), *superseded in other respects by statute*, Civil Asset Forfeiture Reform Act of 2000. To avoid the abuse of the discovery process by either party, the court said it would "fashion any appropriate protective orders sought by the parties to minimize undue disruption to the criminal case." *$6,976,934.65*, 478 F. Supp. 2d at 46. Notwithstanding that its subsequent grant of summary judgment was reversed by the D.C. Circuit, *see* 554 F.3d 123, we find instructive the D.C. district court's course of action after its rejection of outright dismissal.

    [11]Each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury . . . may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citation and quotation marks omitted). Conclusory allegations are not entitled to be assumed true. *See Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1951 (2009). However, at this stage a petition's factual allegations are to be taken as true and are to be construed in favor of the petitioner. *See Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570 (6th Cir. 2005) (citing, *inter alia*, *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); Fed. R. Crim. P. 32.2(c)(1)(A) (for purposes of considering a motion to dismiss a third-party petition for lack of standing in an ancillary proceeding, "the facts set forth in the petition are assumed to

not prove the merits of his underlying claim, but he must claim a facially colorable interest in the seized property" to satisfy the requirements of standing. *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 497-98 (6th Cir. 1998) (citation omitted).

Mary Salti argues that she has sufficiently claimed various interests in the Swiss Account. She maintains she has had Al Ammouri's power of attorney over the Swiss Account at all relevant times. She alleges she has a marital interest in the Swiss Account. She also contends that funds in the Swiss Account were previously held in accounts in her name. Finally, she argues she should be considered the beneficiary of a constructive trust.

### 1.    Power of Attorney

Mary Salti claims that she has standing by virtue of her power of attorney for Al Ammouri. Petitioners filed a copy of Al Ammouri's power of attorney with the district court.[12] Additionally, the petition states that "[t]he accounts"—including, it seems, the Swiss Account—"were not all placed in the name of Mary Salti because at all relevant times Mary Salti had power of attorney for [Al Ammouri], and, therefore, had access to the accounts." Petitioners' attached declarations support this contention. *See* Joint Appendix (J.A.) 163 (Al Ammouri Decl. ¶ 11) ("At all relevant times, Usrah Mary Salti has had power of attorney to act on my behalf."); J.A. 231 (Mary Salti Decl. ¶ 7) ("During all times relevant to this case and prior thereto, I have had a power of attorney to act on behalf of my husband.").

"A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal." *Testa v. Roberts*, 542 N.E.2d 654, 658 (Ohio Ct. App. 1988). The district court reasoned in part that Mary Salti "cannot bring a petition on behalf of Al Ammouri, as Al Ammouri is barred from petitioning the Court due to his status as a fugitive" under the fugitive disentitlement statute. The court was

_____

be true").

[12]The document is subtitled "Ohio Revised Code Section 1337.09" and states that "[q]uestions pertaining to the validity, construction and powers created under this instrument shall be determined in accordance with the laws of the State of Ohio."

correct; if we had upheld Al Ammouri's disentitlement, Mary Salti would be precluded from bringing a claim on his behalf based on his power of attorney. However, because we reverse the district court's dismissal of Al Ammouri's claim at this stage on the grounds of fugitive disentitlement, we also reverse the district court's dismissal of Mary Salti's claim insofar as she is acting on her husband's behalf in these proceedings pursuant to the power of attorney.[13]

### 2.      Marital Interest

Mary Salti also contends she has standing to bring a third-party claim on her own behalf because she has a marital interest in the account. She disputes the district court's conclusion that "Ohio law governs" simply because "[i]t is undisputed that Salti's current legal U.S. residence is in Cincinnati, Ohio." She argues that the applicable law is Switzerland's, which she contends provides for a marital interest in the Swiss Account sufficient to support her standing in this proceeding.[14]

"[T]he general federal practice in forfeiture matters" is to look to "the law of the jurisdiction that created the property right to determine the petitioner's legal interest." *United States v. Speed Joyeros, S.A.*, 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006). We follow this practice, having previously determined that "because '[f]orfeiture proceedings implicate property rights which have traditionally been measured in terms of state law,' and because section 853 contains no rule for determining the scope of property rights, 'it is appropriate to refer to state law in determining the nature of the property interest' involved in a forfeiture proceeding." *United States v. Smith*, 966 F.2d 1045, 1054 n.10 (6th Cir. 1992) (quoting *United States v. Certain Real Prop. Located at 2525 Leroy Lane*, 910 F.2d 343, 349 (6th Cir. 1990)); *see also United States v. Harris*, 246 F.3d 566, 571 (6th Cir. 2001); *2525 Leroy Lane*, 910 F.2d at 348 (observing that

---

[13]We do so without prejudice either to the district court's future disentitlement of Al Ammouri or to any attempt by the Government to argue that Al Ammouri lacks a facially colorable interest in the Account.

[14]The Government argues that Ohio law applies and, because Ohio is not a community property state, Mary Salti has no marital interest in the Swiss Account unless and until she commences divorce proceedings against Al Ammouri. Mary Salti disputes that Ohio law applies and maintains she would have a marital interest in the Account even if it did.

"[p]roperty interests have long been acquired and defined by state law; it was with those interests in mind that Congress drafted provisions for the protection of innocent third parties"). Most other circuits take the same approach. *See, e.g.*, *United States v. 5 S 351 Tuthill Road, Naperville, Ill.*, 233 F.3d 1017, 1021 (7th Cir. 2001) (as amended) ("State law defines and classifies property interests for purposes of the forfeiture statutes, while federal law determines the effect of the property interest on the claimant's standing.").

We reject the district court's seemingly bare conclusion that the governing law is simply the law of the jurisdiction where the person claiming the interest resides. At issue here are funds in a bank account in Switzerland. Pursuant to the general rule discussed above, Swiss law governs in determining whether Mary Salti has a colorable marital interest in the Account. *Cf., e.g.*, *United States v. Real Prop. Located at Incline Vill.*, 976 F. Supp. 1327, 1340-41 (D. Nev. 1997).

This determination, however, is only part of the required analysis. The Government has not conceded that Mary Salti has a sufficient interest in the Account pursuant to Swiss law. Moreover, unlike petitioners, we are not convinced that Swiss *marital* property law entirely governs this inquiry. Swiss banking law may also be relevant regarding the extent of a wife's legal interest, if any, in a bank account held only in her husband's name. To determine the extent of a third party's interest, if any, in the property at issue, courts should closely analyze the law of the state (or, in this case, foreign) jurisdiction. *See* 2 David B. Smith, *Prosecution and Defense of Forfeiture Cases* ¶ 14.08[5] (2009). We remand for such an analysis.

### 3.      Funds Previously in Mary Salti's Name

Mary Salti also maintains she has standing because "the funds sought to be forfeited were previously held in accounts in her name." The petition alleges that "[i]n the early 1990s, the funds now in the Account were in an account in the name of Mary Salti." She argues that "[s]ince this money has previously been held in an account in [her] name . . . , [she] has standing to challenge the forfeiture of the account."

On its own, the allegation that funds in the Swiss Account were previously in Mary Salti's name does not establish a cognizable interest in the Swiss Account. The most Mary Salti might be under this theory is a general creditor of Al Ammouri. We previously observed that "one occupying a position as general creditor may have standing to assert claims against forfeited property under § 853(n)," but

> one must assert something more than being a general creditor; he must show that his legal interest in the property in question is vested or is superior to that of the criminal owner under subsection (A). One may have an "interest" in forfeited property (in the broad sense of being a general creditor) in order to have standing, but he also must make at least a prima facie showing of a "vested" or a "superior" interest to come within the meaning of subsection (A).

*Campos*, 859 F.2d at 1239; *see also DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007) ("As a general creditor . . . , [claimant] does not possess a 'legal right, title, or interest in the property' that was forfeited as required for standing under section 853(n)(6)(A) . . . . Without possessing such an interest 'in' a 'particular, specific asset' that is, or is part of, the forfeited property, [claimant] does not meet the statutory requirements for initiating an ancillary proceeding under section 853(n)." (citations omitted)). The allegation that the funds to be forfeited were previously in Mary Salti's name does not, by itself, confer standing. Nevertheless, it is relevant to her contention that she is the beneficiary of a constructive trust in these funds.

### 4.     Constructive Trust

Mary Salti contends that she has standing as the beneficiary of a constructive trust in the Swiss Account.[15] The district court agreed with Mary Salti that "the existence of a constructive trust would give [her] standing to bring the instant petition," but concluded that she "has offered no evidence, aside from a bare allegation, that such a trust exists." Before reviewing the district court's ruling that Mary Salti did not sufficiently claim a facially colorable interest, we dispose of the Government's

---

[15]A general definition of a "constructive trust" can be found in the Restatement: "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." Restatement (First) of Restitution § 160 (1937).

arguments that she does not hold a "legal interest" in the account because a constructive trust is an equitable remedy, and that because a constructive trust is rooted in equity, it cannot be recognized in the instant case because Mary Salti does not have "clean hands" due to alleged misrepresentations on several of her U.S. tax returns.

First, we reject the Government's contention that a constructive trust is not a cognizable "legal interest" under 21 U.S.C. § 853(n)(2).  Only one circuit appears to subscribe to the theory that cognizable "legal" interests, as that term is used here, cannot include those arising in equity.[16]  Though a constructive trust is properly understood as an equitable remedy, *see Gaymar Indus., Inc. v. FirstMerit Bank, N.A.*, 311 F. App'x 814, 817 (6th Cir. 2009), we previously indicated that a constructive trust would qualify as a "superior" interest under 21 U.S.C. § 853(n)(6)(A).  *See Campos*, 859 F.2d at 1238-39 ("Such a *superior* interest would clearly be one in the nature of a lien, mortgage, recorded security device, *constructive trust*, valid assignment, or the like." (second emphasis added)).  Although other circuits have accurately characterized this statement in *Campos* as dicta,[17] we see no reason not to join the majority of circuits in holding that a constructive trust is a cognizable "legal interest" under § 853(n).  *See Shefton*, 548 F.3d at 1365-66 (reviewing cases and "agree[ing] with the majority of circuits that have held that a constructive trust can serve as a superior legal interest under § 853(n)(6)(A) and thus can serve as grounds for invalidating a criminal forfeiture order").[18]

---

[16]*See United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) (observing that "the term 'legal interest' encompasses only legally protected rights, not equitable rights").

[17]*See United States v. Shefton*, 548 F.3d 1360, 1365 (11th Cir. 2008); *United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185, 1190-91 (D.C. Cir. 1995); *United States v. Schwimmer*, 968 F.2d 1570, 1582 (2d Cir. 1992).

[18]The D.C. Circuit stated that "[a]t the end of the day, we agree with our sister circuits that have rejected the notion that Congress intended to draw the ancient, but largely ignored, distinction between technically legal and technically equitable claims in forfeiture challenges."  *BCCI Holdings*, 46 F.3d at 1190 (citing, *inter alia*, *Campos*, 859 F.2d at 1238-39).  Nevertheless, it "disagree[d] with those courts that have determined that a constructive trust can be interposed as superior to the government's forfeiture claim.  While those courts, in our view, properly rejected the government's legal/equitable distinction, they did not consider whether a judicially imposed constructive trust would be inconsistent with the statutory remedial scheme."  *Id.* at 1191.  This reasoning has been subject to criticism.  *See Shefton*, 548 F.3d at 1366 (explaining that "[a]lthough a constructive trust is a judicially recognized remedy, it arises when the underlying equities exist, not when it is announced" (citation omitted)); *cf. United States v. $4,224,958.57*, 392 F.3d 1002, 1004 (9th Cir. 2004) (as amended) ("It is an elementary mistake to suppose that a court creates the trust.").

We also reject the Government's contention that Mary Salti's "unclean hands" bar her from asserting an equitable interest in the Swiss Account because she represented to the IRS on several of her individual tax returns that she did not have an interest in any foreign bank account and did not attach the requisite Schedule B that would show such an interest. The district court properly rejected this argument, stating that in viewing everything in the light most favorable to Mary Salti, "it is possible that Salti may have negligently, ignorantly, or mistakenly failed to include the Swiss Account on her returns."

The district court ultimately ruled that even if the existence of a constructive trust could suffice for standing, Mary Salti has offered "no evidence, aside from a bare allegation," showing that the funds in the Swiss Account originated with her, and that therefore there was not sufficient support for her position as the beneficiary of a constructive trust in these funds. However, the petition states that Al Ammouri is "the owner" of the Account, and that "[i]n the early 1990s, the funds now in the Account were in an account in the name of Mary Salti." Petitioners explain that "[t]he monies in the Account, in whatever form, have at all times been held by" Mary Salti (among others) "for the use and support of Mary Salti, due to the debilitating and serious heath conditions of" Al Ammouri. By its terms, the petition states that Mary Salti used to have title to the funds in the Swiss Account, and explains away the fact that the funds in the Swiss Account were not in Mary Salti's name anymore because she could still access them with Al Ammouri's power of attorney. Al Ammouri and Mary Salti each filed declarations with the district court supporting these allegations. They also submitted copious bank documents charting the history of funds contained in various accounts, Al Ammouri's power of attorney, documentation of Al Ammouri's various bouts of ill health, and a 1983 letter stating that the Arab Bank had closed an account in Al Ammouri's and his brother's names and transferred the balance to another account "in favour of" Al Ammouri, Mary Salti, and Al Ammouri's nephews. Petitioners have buttressed their allegations with supporting evidence regarding how the funds in the Swiss Account came to be there and showing that funds were once in Mary Salti's name.

Petitioners' explanations for the Swiss Account's legal form, the history of its funds, how the Account was used, and for whose benefit the funds were held are sufficient at this stage to support a claim that although the Swiss Account is in Al Ammouri's name, Mary Salti nevertheless has an interest in the Account, an interest that pre-dated the alleged criminal activity and which was recognized by Al Ammouri as superior to his own interest. Assuming the facts alleged in the petition to be true and considering the evidence filed by petitioners supporting these allegations, we conclude that Mary Salti has presented a facially colorable claim that she should be considered the beneficiary of a constructive trust in the Swiss Account sufficient to support her standing in these proceedings.

**D.      Unconstitutional Delay**

Finally, Al Ammouri and Mary Salti contend that their due process rights have been violated by what they term the Government's "extensive delay" in bringing the forfeiture action. The thrust of their argument is that the Government has known about the Swiss Account since 1996, when it entered into the "Consent Judgment and Settlement Agreement" with Mary Salti, and that a delay this long is "prima facie prejudicial."

*Barker v. Wingo*, 407 U.S. 514 (1972), "provides the framework that we use to determine when the government's delay in bringing a judicial forfeiture action violates the Fifth Amendment right against deprivation of property without due process." *United States v. Ninety Three Firearms*, 330 F.3d 414, 424 (6th Cir. 2003) (citing *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564 (1983)). There are four factors to consider: "the length of the delay, the reason for the delay, the claimant's assertion of his right, and the prejudice to the claimant." *Id.* at 424-25; *see also id.* at 425 (observing that "none of these factors is 'necessary' or 'sufficient,' but rather, they are to be used as guides in balancing the interests of the claimant against those of the government"). "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial,

there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530.

There has been no delay that is presumptively prejudicial to either Al Ammouri or Mary Salti. The Government is seeking to forfeit the Swiss Account as part of Mahmoud's criminal forfeiture. Mahmoud, who himself was a fugitive for some time, changed his plea to guilty in February 2006. The Government was only able to commence forfeiture proceedings against Mahmoud after April 2006, when he amended his February plea agreement. Shortly thereafter, Mahmoud and the Government entered into an agreement by which Mahmoud agreed to the forfeiture of the Swiss Account and its funds, claiming that this property "was involved in Counts 3 and 4 of the indictment, and/or is traceable to such property." The Government then promptly requested an Amended Order of Forfeiture, which the court issued and which triggered the third-party petition. Accordingly, we reject petitioners' argument that there was a delay that violated their constitutional rights.

## III. CONCLUSION

We REVERSE the district court's dismissal of Al Ammouri and Mary Salti's third-party petition and REMAND for further proceedings consistent with this opinion.